IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 04-cv-02264-MSK-MEH

INTERNATIONAL HOUSE OF PANCAKES, INC., a Delaware corporation, and
IHOP PROPERTIES, INC., a California corporation,

      Plaintiffs/Counter Defendants,

v.

RAGHDA ALBARGHOUTHI, as Personal Representative
of the Estate of Isam A. Khanfar, and
1820, INC., a Colorado corporation,

      Defendants/Counter Claimants.

---

## OPINION AND ORDER GRANTING, IN PART, MOTIONS
## FOR SUMMARY JUDGMENT

---

      **THIS MATTER** comes before the Court pursuant to the Plaintiffs' Motion for Summary

Judgment (**# 135**), the Defendants' response (**# 142**), and the Plaintiffs' reply (**# 153**); and the

Defendant's Cross-Motion for Summary Judgment (**# 143**), the Plaintiffs' response (**# 155**), and

the Defendants' reply (**# 157**).[1]

## BACKGROUND

      The following facts are undisputed, except where noted.  This action arises out of a

franchise agreement between the Plaintiffs, franchisors of International House of Pancakes

---

[1]Also pending are the Defendants' Renewed Motion for Extension of Time to Respond (**# 151**) to the Plaintiffs' motion, and the Defendants' Motion for Extension of Time (**# 160**) to file a redacted exhibit under seal.  The filings underlying each of these motions have been made and considered, and thus, both motions are denied as moot.

restaurants ("IHOP"), and the Defendants, operators of an IHOP franchise in Colorado Springs, Colorado.  On September 29, 2006, Defendant Khanfar[2] and IHOP entered into three separate contractual agreements: a Franchise Agreement, entitling Defendant Khanfar to operate the restaurant; a Sublease, entitling Defendant Khanfar's restaurant to occupy a building owned by IHOP; and an Equipment Lease, entitling Defendant Khanfar to use various restaurant equipment for the operation of the restaurant.  In exchange, Defendant Khanfar executed a promissory note to IHOP in the amount of $ 200,000, and agreed to various other terms.

On July 8, 2002, IHOP and Defendant Khanfar contractually agreed to permit Defendant Khanfar to assign all of his rights and obligations with regard to his various agreements with IHOP to a corporation, Defendant 1820, Inc.  That agreement is hereafter referred to as the "Assignment Agreement." At the same time, Defendant Khanfar executed a personal guarantee of Defendant 1820, Inc.'s performance under the terms of the various agreements.

Beginning in late 2002, Defendant Khanfar considered selling his majority[3] interest in 1820, Inc. – and thus, his entire interest and accompanying obligations involving the restaurant – to Mohamed Al Sad,[4] owner of several other IHOP franchises.  The record reflects that on January 1, 2003, Defendant Khanfar and Al Sad entered into a contract to that effect, and there is

_____

[2]Isam Khanfar died on August 21, 2006.  Defendant Albarghouthi appears in a representative capacity on behalf of his estate.  Nevertheless, because the relevant actions in this lawsuit were performed by Mr. Khanfar, the Court will continue to refer to "Defendant Khanfar."

[3]The record reflects that Defendant Khanfar had previously conveyed a minority interest in 1820, Inc. to his wife.

[4]In other documents, Al Sad is referred to as "Mohamed Alsad" or "Mohammed Alsae." For continuity purposes, the Court will use the spelling used in IHOP's default notice, and will modify any quotations involving variant spellings to read "Al Sad."

evidence in the record to indicate that the sale closed at a Board of Directors meeting of 1820, Inc. that same day.  In accordance with the terms of the various agreements between the parties, Defendant Khanfar was required to obtain IHOP's authorization to make the sale, and Defendant Khanfar requested such consent from IHOP.  On April 8, 2003, IHOP rejected the proposed sale, finding that Al Sad was ineligible to own another IHOP restaurant. The Defendants contend that on April 9, 2003, Defendant Khanfar and Al Sad formally terminated any purported sale of 1820, Inc., but on May 27, 2003, IHOP wrote to Defendant Khanfar alleging that "you recently advised the District Court in El Paso County, Colorado that Mohammed Al Sad is the majority owner of the stock of 1820, Inc." *Docket* # 135-12.  IHOP's letter advised that unauthorized sale of 1820, Inc. constituted a default under the various agreements between Defendant Khanfar and IHOP, and requested that, within 10 days, Defendant Khanfar provide IHOP with evidence that Defendant Khanfar remained the owner of 1820, Inc.  The letter advised Defendant Khanfar that failure to comply would result in termination of the franchise.

On  June 18, 2003, Defendant Khanfar responded (through counsel), stating that "the contemplated sale of stock . . . did not close.  It is my understanding that Mr. Al Sad did not take possession of the stock nor of the business operations."  Defendant Khanfar agreed to provide some of the information requested by IHOP, but refused to provide other requested information, such as data concerning Defendant Khanfar and Al Sad's own personal investments.  On November 11, 2003, IHOP wrote back, stating that notwithstanding Defendant Khanfar's claim that the sale was aborted, Defendant Khanfar had testified in court on April 9, 2003 – the same date that Defendant Khanfar and Al Sad purportedly agreed to abort the sale – that he had transferred his 51% interest in 1820, Inc. to Al Sad as of January 1, 2003, and had no ongoing

3

interest in the business.  IHOP advised Defendant Khanfar that he was in breach of the various

contracts, either because he sold 1820, Inc. to Al Sad without permission, or because he had

committed perjury in testifying that he had done so.  As  a result, IHOP stated that it was

terminating the various agreements between the parties, effective December 2, 2003, unless

Defendant Khanfar produced sufficient evidence to explain the discrepancy.  According to a

December 12, 2003 letter from IHOP, Defendant Khanfar did not respond to the November 11,

2003 letter purporting to terminate the franchise, but IHOP nevertheless allowed Defendant

Khanfar an extension until December 29, 2003 to provide an explanation.  The letter further

advised that IHOP would terminate the franchise as of December 29, 2003 if no explanation was

forthcoming.  According to IHOP, Defendant Khanfar did not provide an adequate explanation by

December 29, 2003, and IHOP deemed the franchise terminated.

   Nevertheless, Defendant Khanfar continued to conduct business at the restaurant.  On

March 27, 2004, IHOP served a Demand for Possession on the Defendants, requiring that they

surrender the premises within 3 days.  The demand, inexplicably dated January 15, 2004, was

taped to the front door of the restaurant during business hours.  Nevertheless, the Defendants

continued to operate the restaurant and tender rent and royalty payments pursuant to the

agreements.  Beginning at the time IHOP terminated the franchise in December 2003, IHOP

received, but did not cash, several weekly checks from the Defendants.  However, on May 26,

2004, IHOP advised the Defendants that IHOP would be cashing the accumulated checks and

depositing the proceeds in a segregated account.  IHOP deposited the checks, but at least 18

checks worth approximately $ 120,000 were returned for insufficient funds.  The Defendants

point to their bank statement that shows that adequate funds were available in the account to pay

nearly all of the checks, but explain that their bank's policy permitted the bank to reject an entire batch of checks presented at once if funds were not available to pay every check presented in the batch.  (A letter from the Defendants' counsel indicates that on July 24, 2006, the Defendants tendered the full amount of the dishonored checks to IHOP.)

On April 13, 2004, IHOP commenced this action in the Colorado District Court for El Paso County, alleging seven claims: (i) unlawful detainer; (ii) trademark infringement under the Lanham Act, 15 U.S.C. § 1114, based on the Defendants' continuing, unauthorized use of IHOP's trademarks; (iii) unfair competition under the Lanham Act, 15 U.S.C. § 1125, based on the Defendants unauthorized use of IHOP's trademarks; (iv) breach of contract, arising out of the Franchise Agreement; (v) breach of contract, arising out of Defendant Khanfar's guaranty; (vi) breach of contract, relating to the Equipment Lease; and (vii) breach of contract, relating to the promissory note.

IHOP did not serve the Summons on the Defendants until October 7, 2004, and on October 28, 2004, the Defendants properly removed **(# 1)** the action to this Court on federal question grounds.  On November 12, 2004, the Defendants filed an Answer and Counterclaim **(#4)**, alleging five counterclaims: (i) violation of 42 U.S.C. § 1981, in that IHOP's actions constituted discrimination against Defendant Khanfar based on his Arab-American national origin; (ii) a seemingly similar violation of 42 U.S.C. § 1981; (iii) breach of contract, in that IHOP failed to comply with the termination procedures and improperly declared defaults in violation of the Franchise Agreement; (iv) breach of the covenant of good faith and fair dealing, on similar grounds as the breach of contract claim; and (v) abuse of process, in that IHOP commenced this

action for the improper purpose of taking the Defendants' property without compensation and in furtherance of a scheme to discriminate against Arab-Americans.

While this action was pending, IHOP learned that Defendant Khanfar had been the subject of a $ 450,000 judgment entered in Wisconsin in March 2003, and that the judgment remained outstanding.  On October 18, 2005, IHOP wrote to Defendant Khanfar, advising that the existence of the outstanding judgment (as well as Defendant Khanfar's alleged pledging of IHOP property as collateral, details of which are not in the record) constituted a breach of the parties' agreements.   IHOP required that Defendant Khanfar satisfy the judgment within seven days, and advised him that failure to do so would constitute an independent basis for terminating the franchise (to the extent the prior termination was incomplete or unsuccessful).  On October 19, 2005, IHOP again wrote to Defendant Khanfar, advising him that his failure "to meet your monetary obligations" – namely, approximately $ 165,000 in rent, royalties, and expenses that were overdue and unpaid – constituted a default,[5] and demanding that Defendant Khanfar cure that default within seven days or suffer (another) termination of the franchise.

IHOP later filed an Amended Complaint (**# 20**), abandoning all but the unlawful detainer claim, then amended again (**# 62**) to reinstate all of its earlier claims, and to add additional claims for unjust enrichment, breach of the Sublease, and breach of the Assignment Agreement.  The Defendants subsequently amended their counterclaims (**# 63**) to add a claim for retaliation in violation of 42 U.S.C. § 1981, based on the additional default notices, as retaliating against the Defendants for "refus[ing] to agree to Plaintiffs' unreasonable settlement demands"; and a claim

---

[5]As discussed more fully herein, the record does not reflect to what extent, if any, this alleged default relates to the checks that IHOP held, and which were later returned to the Defendants for insufficient funds.

for retaliation under the Colorado Anti-Discrimination Act, C.R.S. § 24-34-402, on similar grounds.

IHOP now moves for summary judgment (# 135) on all of its claims, as well as on each of the Defendants' counterclaims.  The Defendants cross-move (# 143) for summary judgment on IHOP's unlawful detainer claim.

**ANALYSIS**

Certain of the claims in this action interrelate, such that success on one is sometimes a predicate to or, arguably, a negation of, another.  Specifically, IHOP's unlawful detainer claim is premised upon the assumption that the Defendants are in breach of the Sublease, and the Defendants' alleged breach of the Sublease turns, in part, on whether or not the Defendants have breached the Franchise Agreement.  IHOP's trademark claims also turn on whether the Defendants' rights to use such trademarks terminated as the result of breaches of the various agreements.  Similarly, an argument can be made that the Defendants' success on their civil rights counterclaims might negate, in part or whole, some of IHOP's claims.  Likewise, the Defendants' satisfactory performance under the contracts is a matter bearing on the elements of their civil rights claims.  Accordingly, the Court will proceed to analyze the claims and counterclaims in the most logical order.  First, the Court will assess the various contract claims and counterclaims, then consider the civil rights counterclaims, then the unlawful detainer claim, and finally, the trademark claims and remaining claims.

**A.  Standard of review**

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary.  *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995).

Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Substantive law governs what facts are material and what issues must be determined. It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof and identifies the party with the burden of proof. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989). A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter for either party. *See Anderson*, 477 U.S. at 248. When considering a summary judgment motion, a court views all evidence in the light most favorable to the non-moving party, thereby favoring the right to a trial. *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

If the moving party does not have the burden of proof at trial, it must point to an absence of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove. If the respondent comes forward with sufficient competent evidence to establish a *prima facie* claim or defense, a trial is required. If the respondent fails to produce sufficient competent evidence to establish its claim or defense, the claim or defense must be dismissed as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

If the moving party does have the burden of proof at trial, it must come forward with sufficient competent evidence to establish every element of the claim or defense on which judgment is sought; the respondent then has the obligation to come forward with evidence showing the existence of a genuine dispute of material fact with regard to one or more elements of that claim or defense. *Id.*

8

### B.  Contract-based claims

IHOP asserts that the Defendants breached the Franchise Agreement, Equipment Lease, Sublease, Assignment Agreement, guaranty, and promissory note.  The Defendants' breach of contract counterclaim alleges that IHOP violated the termination procedures in the Franchise Agreement, and their breach of the covenant of good faith and fair dealing alleges a similar violation.

IHOP contends that all of the formal agreements between the parties call for the application of California law, insofar as the Franchise Agreement states "This Agreement and the legal relations among the parties hereto shall be governed by and construed in accordance with the laws of the state of California."  The Defendants allege that IHOP "waived the governing law provision of the Franchise Agreement in asserting a claim under the Colorado F.E.D. statute," but offer no citation for this proposition.

An unlawful detainer action is simply the modern statutory equivalent of the common-law action for ejectment, *Baumgartner v. Schey*, 353 P.2d 375, 379 (Colo. 1960), an action that is "but a proceeding *in rem*."  *Creighton v. Kerr*, 1 Colo. 509, 511 (Colo. Terr. 1872).  As an *in rem* action, Colorado law necessarily applies to claims seeking ejectment of persons from property located in Colorado.  Put differently, there is no way in which IHOP could invoke California's substantive real property law to dispossess the Defendants from property in Colorado.

Moreover, a party asserting waiver in Colorado must show that their opponent intentionally relinquished a known right.  *In re Marriage of Hill*, ___ P.3d ___, 2007 WL 1558502 (Colo. App. May 31, 2007); *Ross v. Old Republic Ins. Co.*, 134 P.3d 505, 510 (Colo.

App. 2006).  In the absence of an express waiver of the right, an implied waiver may be shown by the party engaging in conduct that clearly and unambiguously manifests an intent to relinquish the right.  *Id.*  The Court cannot find that IHOP's decision to commence an unlawful detainer action under Colorado law, involving property in Colorado, clearly and unambiguously reflects an intention to relinquish a contractual agreement between the parties that their contractual rights would be interpreted under California law.  Accordingly, the Court finds that California law applies to the interpretation of the Franchise Agreement.

To state a claim for breach of contract under California law, a party must show: (i) the existence of a contract; (ii) breach by the defendant; (iii) performance or excuse therefor by the plaintiff; and (iv) damages.  *First Commercial Mortgage Co. v. Reece*, 108 Cal.Rptr.2d 23, 33 (Cal. App. 2001).  Here, the parties do not dispute that the first element is satisfied.

Turning first to IHOP's own claims for breach of contract,[6] IHOP contends that the Defendants breached the Franchise Agreement by transferring ownership to Al Sad without approval; failing to satisfy a judgment entered against Defendant Khanfar in Wisconsin; failing to make required payments to IHOP; and continuing to operate the franchise after it had been

---

[6]In addition to the Franchise Agreement, IHOP alleges claims for breach of contract with regard to five other agreements: the Sublease, Assignment Agreement, Equipment Lease, Guaranty, and Promissory Note.  All five contain provisions that are similar in operation to or which relate to rights and obligations in the Franchise Agreement.  As a result, a breach by the Defendants of one agreement may – but does not necessarily – constitute a breach of other agreements as well.  Because the Franchise Agreement contains the most overarching statement of the parties' deal, the Court will focus its analysis on the alleged conduct as it bears on the obligations in that document.  To the extent a breach of the Franchise Agreement is found in any respect, the Court will also identify any other contract(s) affected by that breach.  Where no breach of the Franchise agreement has occurred, no other agreement has been breached by that same conduct.

terminated.  IHOP alleges that it performed its own obligations under the agreement by giving notice of these defaults and an opportunity to cure as required by the Franchise Agreement.

### 1.  breach resulting from sale to Al Sad

Turning first to the sale of the franchise to Al Sad, Section 11.02 of the Franchise Agreement states "Franchisee shall have the right to assign, transfer or sell its interest in this Agreement, upon the terms and conditions provided herein."  Section 11.03(a)(ii) states that "Franchisee shall obtain Franchisor's written consent, not to be unreasonably withheld, of the proposed assignment."

IHOP has come forward with substantial evidence that Defendant Khanfar transferred ownership of 1820, Inc. to Al Sad on January 1, 2003.[7]  Among other things, IHOP has produced minutes of a January 1, 2003 stockholder's meeting for 1820, Inc. that records that "IT WAS RESOLVED that Sam A. Khanfar be permitted to proceed with the sale of his stock to Mohamed Alsad," and that "the closing of the stock sale thereupon took place."  IHOP also produced a Power of Attorney dated January 1, 2003 that states "SAM A. KHANFAR hereby sells, assigns, and transfers to MOHAMAD ALSAD, 5,000 shares of Common Stock standing in his name on the books of 1820, Inc."  The record is also clear that IHOP refused to consent to the sale, and so informed the Defendants on April 8, 2003.

---

[7]IHOP also points to evidence that Defendant Khanfar transferred a minority interest in 1820, Inc.'s stock to his wife without IHOP's permission, and that, on another occasion, he pledged his stock to Al Sad as collateral for a loan.  However, the May 23, 2003 Notice of Default by IHOP specifically refers only to the sale of stock to Al Sad.  Arguably, Section 12.02 of the Franchise Agreement permits IHOP to terminate a franchise without prior notice as a result of a prohibited assignment, but in reviewing the various correspondence between the parties, the Court finds no contemporaneous assertion by IHOP that it was terminating the Defendants' franchise based, in part or whole, on the transfer to Defendant Khanfar's wife.  Accordingly, the Court considers the termination only with regard to the sale of 1820, Inc. to Al Sad.

The Defendants respond that the sale of stock to Al Sad was contemplated, and various documents were drawn up in its anticipation, but that the sale was aborted on April 9, 2003 when IHOP refused to approve it.  As evidence of these facts, the Defendants rely entirely on a one-page document, dated April 9, 2003, and entitled "Termination of Agreement to Purchase Corporate Stock."  It reads, in its entirety, "Now come Sam A. Khanfar and Mohamad Al Sad and do hereby terminate that certain Agreement to Purchase Corporate Stock of 1820, Inc. dated January 1, 2003."  The document is purportedly signed by both Defendant Khanfar and Al Sad. IHOP objects to the Defendants' reliance on this document, alleging that it is "unattested [and] inadmissible . . . for which no foundation has been laid."

It is not necessary that the party opposing summary judgment produce evidence in a form that would be admissible at trial, so long as the evidence is of the type envisioned in Fed. R. Civ. P. 56(c).  *Celotex*, 477 U.S. at 324.  Rule 56(c) contemplates that summary judgment may be opposed by the use of "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any."  The April 9, 2003 memo relied upon by the Defendants does not fall within any of these categories.  Most importantly, it is merely attached as an exhibit to the Defendants' brief; it is not an exhibit to an affidavit from an affiant with knowledge of the document and its contents.  Without some indication that there is a competent witness who can lay a sufficient foundation for this document,[8] the Court cannot assume that, at trial, the memo "would be available to the jury" at trial and thus, the Court cannot consider it at the summary

---

[8]Although it is understandable that no affidavit from Defendant Khanfar is submitted, it is peculiar that the Defendants have not submitted an affidavit or deposition from Al Sad or 1820, Inc.'s corporate Secretary, explaining the events involving the sale of stock and its purported rescission.

judgment stage. *Trevizo v. Adams*, 455 F.3d 1155, 1160 (10th Cir. 2006), *citing Argo v. Blue Cross and Blue Shield of Kansas, Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006).

Even assuming that the April 9, 2003 memo was properly before the Court, it does not create a genuine issue of fact as to whether Defendant Khanfar transferred ownership of 1820, Inc. to Al Sad without IHOP's permission. IHOP has produced evidence of 1820, Inc.'s own corporate minutes that indicate that "the closing of the stock sale . . . took place" on January 1, 2003. The Defendants have adduced no contrary evidence to establish that the sale did not, in fact, close at that time.[9] Even if the April 9, 2003 memo's contents were given full effect, it would establish only that Defendant Khanfar and Al Sad terminated the "Agreement to Purchase Corporate Stock," not that they undid the actual transfer of stock itself. Of course, once the transaction was completed, the fact that the parties agreed to void an agreement regarding their intentions to enter into the transaction does not necessarily void the transaction as well, any more than the buyer and seller of a house agreeing to void the contract of sale would undo a transfer of title that has already taken place.

Accordingly, the Court finds that IHOP has established that the Defendants breached the Franchise Agreement by assigning Defendant Khanfar's interest to Al Sad.[10]

---

[9]The Defendants argue that there is no evidence that the actual transfer of shares was legally effectuated by physical delivery of a stock certificate to Al Sad. Although true, it is equally fair to say that there was not evidence that the transfer was not so effectuated. The absence of any evidence on this point, pro or con, merely forces the Court to examine the sufficiency of the evidence that actually exists in the record, and the Court finds that corporate minutes that memorialize the closing of a sale are persuasive evidence that the sale was completed.

[10]IHOP contends that this conduct also breaches the Sublease, Assignment Agreement, and Guarantee. For reasons stated later in this Opinion, the Court finds that the assignment did not breach the Sublease. The Court finds that the assignment does breach Sections 2(a) and 3(c)

2. <u>breach by incurring judgment in Wisconsin</u>

Section 12.01(f) of the Franchise Agreement permits IHOP to declare a default if "any judgment against Franchisee remains unsatisfied or unbonded of record for 15 days."  IHOP has produced proof that Defendant Khanfar was the subject of a judgment in Wisconsin in 2003, and that as of the October 18, 2005 notice of default, that judgment remained unsatisfied.  The Defendants argue that the Franchise Agreement only prohibits outstanding judgments against the "Franchisee," and that as a result of the IHOP-approved assignment of Defendant Khanfar's franchise to 1820, Inc., the corporate entity, not Defendant Khanfar himself, is the only "Franchisee."  Thus, because the judgment was not taken against 1820, Inc., the Defendants argue that no breach of the Franchise Agreement occurred.  In reply, IHOP points to Section 3(a) of the Assignment Agreement, which states that "Shareholder [*i.e.* Defendant Khanfar] and Assignee Corporation [*i.e.* 1820, Inc.] each covenant that they, and each of them, will be jointly and severally liable to IHOP for the performance of the duties . . . under the Franchise Documents."

IHOP's argument on this point is misplaced.  Although the Assignment Agreement holds Defendant Khanfar <u>liable</u> "for the performance of the duties," it does not purport to modify the duties stated in the Franchise Agreement – that is, that the "Franchisee" must promptly satisfy any judgment against it.  Once Defendant Khanfar assigned his interests in the Franchise Agreement to 1820, Inc., the corporate entity became the "Franchisee" subject to the no-judgments obligation, and Defendant Khanfar's agreement to be liable to ensure that 1820, Inc. performed that duty does not alter that term of the Franchise Agreement.  IHOP's argument goes further, contending

---

of the Assignment Agreement.  The assignment does not breach any substantive provision in the Guaranty, but by operation of the Guaranty, Defendant Khanfar is personally liable for any breach committed by 1820, Inc.

14

that by agreeing in the Assignment Agreement to be held liable for the performance of the

Franchise Agreement, Defendant Khanfar agreed that all of the various duties and obligations of

the "Franchisee" under that agreement would continue to remain personal to him, notwithstanding

the purported assignment of his rights and obligations under that agreement to 1820, Inc.  If

accepted, IHOP's argument renders much of the letter and spirit of the Assignment Agreement to

be a nullity, as Defendant Khanfar would remain the "Franchisee" under the Franchise Agreement,

notwithstanding the assignment of his interest to the corporate entity.  Because the Court finds

that Defendant Khanfar was not longer the "Franchisee" against whom judgments could not be

recorded under the terms of the Franchise Agreement, the entry of a judgment against him

personally does not breach that, or any other, agreement.

### 3. breach relating to unpaid rents and royalties

IHOP asserts, in its October 19, 2005 default notice, that the Defendants failed to pay

more than $ 160,000 in rent, royalties, and other payments due and owing.  However, beyond the

allegations in the default notice, IHOP has not come forward with any competent evidence as to

this issue.  Notably, the affidavit of William Gunstream, to which the default notice is attached,

does not purport to assert, based on personal knowledge, that the sums listed in the October 19,

2005 default notice are indeed due and owing.  Rather, Gunstream's affidavit merely states that

"based on [the Defendants' holdover operation of the restaurant and the discovery of the

Wisconsin judgment] IHOP sent Defendants two Supplemental Notices of Default."  Without an

attestation from someone with personal knowledge as to the nature and amount of the sums

owing, the October 19, 2005 notice of default lacks evidentiary value in the same manner as the

April 9, 2003 memo terminating the sale of stock to Al Sad.[11]  Accordingly, IHOP has not come

forward with competent evidence of a breach of any monetary obligations.

4. breach based on holdover operation

IHOP contends that the Defendants' continued operation of the restaurant violates the

various agreements.  Specifically, the Court finds that such operation violates Section 15.01 of the

Franchise Agreement, which states that upon termination of a franchise, the franchisee "shall not

thereafter operate or do business under" the IHOP name.  Article III of the Sublease provides that

the premises leased by the Defendants "shall be used only for the purpose of conducting thereon

an [IHOP] restaurant franchised by" IHOP, in conformance with the terms of the Franchise

Agreement.  It is undisputed that, notwithstanding IHOP's termination of the franchise, the

Defendants have continued to operate the restaurant as if it were a duly-franchised restaurant.

The Defendants offer two arguments in response.  The first is limited to IHOP's allegation

that their holdover operation violates the Sublease.  (Except as discussed below, the Defendants

do not dispute that the operation violates the Franchise Agreement or any agreement other than

the Sublease.)  The Defendants argue that the Sublease does not automatically terminate as a

result of the termination of the Franchise Agreement, and that IHOP has not given notice of its

intent to terminate the Sublease as required by that document.  Putting aside the fact that this

---

[11]Exhibit A14 to Gunstream's affidavit are various checks from 1820, Inc. to IHOP that were apparently returned for insufficient funds.  The checks themselves do not identify what they purport to pay – the "memo" section of each check merely states "Week ending [dates between November 2003 and May 2004]."  Gunstream's affidavit is no more clear.  He merely states "Defendants' payment of fees to IHOP in the form of checks to IHOP were rejected due to insufficient funds."  Gunstream does not state what fees these rejected checks were intended to remit.  Absent facts establishing the connection, the Court cannot simply assume that these checks somehow relate to the notice of default issued in October 19, 2005.

argument does not address the Defendants' clear violation of Article III of the Sublease, it nevertheless lacks merit on its own terms.  Article XI(b) of the Sublease provides that, upon default, IHOP may either reenter the premises and expel the Defendants, or give written notice of IHOP's intention to terminate the lease.  Article XIV of the Sublease provides that notices required by its terms must be given in writing and served personally or by registered or certified mail upon the recipient, including the franchisee at the restaurant's location.  The Sublease does not purport to prescribe the contents of any such notice.  IHOP argues that the May 27, 2003 notice of default suffices to terminate the Sublease.  That document notes that it was sent via certified mail to the restaurant location, and states that "If you . . . fail to comply full with the requirements listed above in all respects, the franchise . . . and all its rights under the Leases will terminate effective 10 days after your receipt of this letter."  Although the deadline for compliance was extended by subsequent notices, it is clear that IHOP eventually terminated the Sublease by giving the notice required under the terms of that agreement.

The Defendants also argue that IHOP waived any objection to its holdover operation by continuing to accept rent and royalty payments.  IHOP persuasively argues in response that Section 20.01 of the Franchise Agreement specifically prevents it from waiving any right with regard to the Defendants' defaults.  Moreover, for similar reasons discussed above, the Defendants have not come forward with evidence demonstrating that IHOP's receipt of payments reflected its intent to waive any right to prevent the Defendants' holdover operation.  Indeed, the commencement of this action and the default notices from 2005 are persuasive evidence that IHOP did not intend to waive its right to prevent such continued operation.  Accordingly, the

Court finds that the Defendants' continued operation of the restaurant constitutes a breach of the Franchise Agreement and Sublease.[12]

     5.  <u>remaining elements</u>

IHOP must also establish that it performed its own obligations under the Franchise Agreement. In this regard, the parties focus their attention on the Agreement's procedural requirements for notification of default and termination of the franchise. Section 12.01 of the Agreement states that "Franchisor may terminate this Agreement prior to its expiration after providing written notice of Franchisee's Material Breach . . ., if such Material Breach is not cured within seven days." The term "Material Breach" includes any "failure to comply with any other material obligation of the Franchisee under the agreements." Section 12.03 requires that a notice of default: (i) identify the specific provision of the specific agreement that was violated; (ii) identify the nature of the violation; and (iii) identify the date the violation was observed and reported, and identify by whom.

Here, it is undisputed that IHOP provided written notice to the Defendants on May 27, 2003, advising them that "We have been advised that the Franchised Restaurant . . . has been sold to Mohamed Al Sad," and that IHOP had not consented to that sale. The letter advised the Defendants that this action violated Sections 11.02 and 11.03 of the Franchise Agreement, among others. This sufficiently complies with the requirements of the Franchise Agreement that the specific violated term be identified and that the nature of the violation be disclosed. The

---

[12]The Court further finds that the Defendants' holdover operation violates Article II of the Equipment Lease, insofar as the equipment is no longer being used "in conformity with the terms of the Franchise Agreement." The Court finds that holdover operation does not violate Section 3(a) of the Assignment Agreement, as that provision is merely a guaranty of liability, not a substantive obligation to avoid holdover operation.

Defendants argue that the notice does not identify the date and identity of the person reporting the violation.  However, the notice states "You recently advised the District Court in El Paso County, Colorado that Mohamed As Sad is the majority owner of the stock of 1820, Inc."  The Court finds that this is sufficient to advise the Defendants of when the violation was observed (as a result of "recent" testimony by Defendant Khanfar in El Paso County), and by whom (that the violation was self-reported by Defendant Khanfar through his testimony).[13]  The Defendants also argue that the notice of default imposed unreasonable conditions of cure, requiring not only that the Defendants confirm Defendant Khanfar's ownership of the stock, but also that they produce personal financial data for both Defendant Khanfar and Al Sad.  The Court finds nothing in the Franchise Agreement that limits the scope of the cure that IHOP can demand, but in any event, the record is undisputed that the Defendants did not even produce adequate proof that Defendant Khanfar retained ownership of the 1820, Inc.'s stock, and thus, did not cure the default in even the most minimal sense.

Because the Court finds that IHOP properly terminated the Franchise Agreement in 2003, no further default notice was required under the now-terminated agreement with regard to the Defendants' separate breach resulting from holdover operation.[14]  Because the Franchise

---

[13]One could argue that the default notice was technically required to advise the Defendants of who it was that brought Defendant Khanfar's testimony to IHOP's attention, but the Court finds this reading inconsistent with both the letter and the spirit of the Franchise Agreement.  The clear intent behind the requirement that the person reporting a violation be identified is to allow the franchisee to confront his or her accuser.  Here, the Defendants' accuser is Defendant Khanfar himself, through his own words.  Knowledge that a particular informant sent a transcript of Defendant Khanfar's testimony to IHOP would not give the Defendants any greater ability to respond to the default notice.

[14]By its express terms, Section 15.01 of the Franchise Agreement – the provision that prohibits a terminated franchisee from continuing to operate under the IHOP name – survives the

Agreement had already been terminated at the time of this default, IHOP had no contractual duty to supply any additional information or notice when it terminated the franchise based on holdover operation.  Accordingly, the Court finds that IHOP has established that it performed its duties under the contract, and the Defendants have not come forward with evidence demonstrating a genuine issue of fact on this point.

Finally, IHOP is required to show that it was damaged by the Defendants' breach.  It has done so by showing that the Defendants have continued to operate the franchise and exploit IHOP's trademarks, despite being prohibited from doing so by the termination of the Franchise Agreement.  Section 15.01 of the Franchise Agreement provides that, upon termination of a franchise, the franchisee will "discontinue the use of Franchise's Trademarks and shall not thereafter operate or do business" using the IHOP name.  It is undisputed that, notwithstanding the termination of the Franchise Agreement, the Defendants have continued to operate the restaurant using the IHOP name and trademarks without permission.

The Defendants argue that IHOP has suffered no harm from their prohibited use of IHOP's trademarks because IHOP's website continues to report that the location is an authorized IHOP restaurant.  The printouts supplied by the Plaintiff purports to show "IHOP restaurants nearest the point you clicked," and says nothing about whether a particular restaurant is operating as an authorized franchisee, a holdover tenant operating in violation of the Franchise Agreement, or in some other legal status.  In any event, as IHOP points out in reply, the extent of customer confusion as to the legitimacy of the Defendants' continued operation might bear on the <u>amount</u>

termination of the Franchise Agreement.

20

of damages suffered, but does not completely negate the <u>fact</u> that some amount of damages resulted.

Accordingly, the Court finds that IHOP is entitled to summary judgment on its claim for breach of the Franchise Agreement, Sublease, Assignment Agreement, and Equipment Lease. The Court finds that IHOP has not proven any substantive violation of the Guaranty or the Promissory Note, and denies summary judgment on the contract claims premised upon the alleged breach of these two agreements..

6. <u>Defendants' breach of contract counterclaim</u>

The Court then turns to the Defendants' counterclaim for breach of contract. IHOP seeks summary judgment on this counterclaim on the grounds that the Defendants cannot show that they were performing their duties under the agreements, or that IHOP breached the agreements. The Defendants do not tender a separate response to IHOP's motion, but simply asserts that it can demonstrate a triable issue of fact "as established above and in Defendants' Cross-Motion for Partial Summary Judgment." The preceding discussion disposes of any argument by the Defendants that they can show a genuine issue of fact with regard to whether they performed their own contractual duties and whether IHOP failed to perform its obligations. The Court has reviewed the Defendants' Cross-Motion for Summary Judgment and finds nothing therein that would alter this conclusion. Notably, the Defendants' Cross-Motion focuses solely on the unlawful detainer claim and its statutory requirements. Accordingly, IHOP is entitled to summary judgment on the Defendants' breach of contract counterclaim.

7.  breach of covenant of good faith and fair dealing counterclaim

Under California law, every contract imposes upon all parties an implied duty of good faith and fair dealing.  *Tilbury Constructors, Inc. v State Compensation Ins. Fund*, 40 Cal.Rptr.3d 392, 396 (Cal. App. 2006).  That burden requires that the parties "do everything that the contract presupposed they will do to accomplish its purpose" and to avoid doing anything that would injury the right of the other to receive the benefits of the agreement.  *Id.*  In order to establish such a claim, the claimant must show that the conduct of their opponent, whether or not it also constitutes a breach of a contract term, demonstrates a failure or refusal to discharge contractual responsibilities, and is accompanied by a conscious, deliberate act that frustrates the common purpose of the agreement.  *Chateau Chamberay Homeowners Assn. v. Associated Internat. Ins. Co.,* 108 Cal.Rptr.2d 776, 783 (Cal. App. 2001).  Here, IHOP contends, among other things, that the Defendants cannot show that IHOP acted deliberately to frustrate the purpose of the parties' agreements.

The Defendants respond that "IHOP used its discretion under the Franchise Agreement to declare fictitious defaults and treated the Sublease as terminated," and that "IHOP used its discretion as the Franchisor to manufacture a fictitious default by holding 1820, Inc.'s checks for a five month period."  As to the first argument, the discussion above demonstrates that at least some of the defaults declared by IHOP were valid and justified, and thus, IHOP's termination of the Franchise Agreement pursuant to these defaults was in no way improper.  With regard to the second argument, the Court notes that at no time has IHOP taken the position that the returned checks constituted a default under the Franchise Agreement, nor has it purported to terminate the

Franchise Agreement based on that incident; to the extent it has, the Court has rejected any such purported default and termination.

Accordingly, the Court finds that IHOP is entitled to summary judgment on the Defendants' counterclaim for breach of the covenant of good faith and fair dealing.

### B. Civil rights counterclaims

The Defendants raise four counterclaims for which IHOP seeks summary judgment, two alleging discrimination under 42 U.S.C. § 1981, one alleging retaliation under § 1981, and one alleging retaliation under the Colorado Anti-Discrimination Act, C.R.S. § 24-34-402.

42 U.S.C. § 1981 prohibits discrimination on the basis of race in the making, performance, modification, and termination of contracts.  Analysis of claims of discrimination arising under § 1981 is similar to that of claims under Title VII or 42 U.S.C. § 1983.  *Maldonado v. City of Altus*, 433 F.3d 1294, 1307 (10th Cir. 2006).  Although the precise articulation of the elements varies based on the nature of the claim asserted, in general, the Defendants are required to make a *prima facie* showing: (i) that they are members of a protected class; (ii) that IHOP intentionally discriminated against them on the basis of their race; and (iii) that the discrimination interfered with a right related to the making or enforcement of a contract.  *See Hampton v. Dillard Department Stores, Inc.*, 247 F.3d 1091, 1101-02 (10th Cir. 2001).  The second element can be established, for example, by showing that the claimant was entitled to some contractual benefit, that their opponent intentionally interfered with that entitlement, and that the claimant's race was a motivating factor in the opponent's decision to do so.  *Id.* at 1102-03.

Here, the Defendants assert that IHOP interfered by terminating the Franchise Agreement in response to the Defendants' attempted sale to Al Sad, and that in doing so, it treated the

Defendants differently than it treated other, non Arab-American franchisees who attempted to sell

their franchise.  Much of the Defendants' evidence on this point involves two attempts by a

white[15] IHOP franchisee named Michael Roslin.  Roslin initially attempted to sell his IHOP

franchise to Defendant Khanfar in 2000.  Although the parties entered into a Purchase Agreement,

the sale did not actually close.  The Defendants contend that this situation reflects disparate

treatment, because IHOP "did not issue written notice of default based upon the sale or attempted

sale of the franchise without prior IHOP approval," but rather, "worked with Roslin, walking him

through the process."  The Court finds that this situation is insufficiently similar to the situation

presented here to permit any inference of discriminatory treatment to be drawn. Unlike the sale to

Al Sad, which closed on January 1, 2003, the sale from Roslin to Defendant Khanfar did not

close.  Thus, unlike Al Sad, Defendant Khanfar never took ownership of Roslin's franchise.[16]

Also absent from the Defendants' description of Roslin's situation is any suggestion that Roslin

resisted efforts by IHOP to clarify the ownership status of its franchisee, or evidence that Roslin

made representations to IHOP that were inconsistent with sworn testimony he had given in a legal

---

[15]There is no actual evidence in the record of Roslin's ethnicity.  The Defendants assert in their brief, without citation, that he is "a white man."

[16]The Defendants take IHOP to task for "walking [Roslin] through the process" of seeking approval for the transfer.  However, there is no evidence in the record here that IHOP did not similarly assist Defendant Khanfar in applying for IHOP's permission to sell the franchise to Al Sad.  The evidence here merely shows what happened <u>after</u> IHOP had refused to consent to the sale and later discovered that, notwithstanding its lack of consent, Defendant Khanfar had already transferred ownership to Al Sad.

proceeding. These matters clearly distinguish Roslin's proposed sale to Defendant Khanfar, such that the Court can draw no inference of discrimination from it.[17]

The Defendants also point out that Roslin later found another buyer for his franchise. Unlike the situation described above, according to the Defendants, Roslin closed on this sale and did not obtain IHOP's approval for an additional four months. Once again, this situation is not factually analogous for several reasons. First, there is no indication in the Franchise Agreement or anywhere else in the record that IHOP's permission to assign a franchise must be obtained prior to the purported assignment. Section 11.03 of the Franchise Agreement here merely requires IHOP's consent to an assignment, but does not indicate when that consent must be obtained. Thus, the mere fact that both Roslin and the Defendants engaged in a transfer of their respective franchises before seeking IHOP's approval is not controlling. However, the fact that Roslin ultimately obtained approval for his transfer but the Defendants did not is critical. The Defendants' failure to obtain approval and failure to thereafter rescind the assignment to Al Sad clearly distinguishes the instant case from the situation with Roslin. Moreover, once again, the Roslin situation does not include the particularly troubling elements of Defendant Khanfar's refusal to comply with IHOP's request for additional information and the inconsistency between Defendant Khanfar's representations to IHOP about the assignment and Defendant Khanfar's sworn testimony. These matters are sufficiently serious so as to render the Roslin situation entirely dissimilar for purposes of inferring discriminatory intent.

---

[17]Even assuming that the situations were factually similar, the Court would still be unable to draw any inference that IHOP discriminates against Arab-Americans simply because of one incident in which a white franchisee was treated differently from an Arab-American one, particularly in the absence of any evidence suggesting that ethnicity, as opposed to any one of a variety of neutral factors, was the deciding factor.

Finally, the Defendants point to a log that purportedly details situations in which "IHOP works cooperatively with other franchisees who want to sell their franchises to third parties" and a list of franchisees subject to default notices which shows that a "disproportionate number of the termination IHOP franchisees have names of Arab-American ancestry."  With regard to the former, the Court notes that none of the entries on the chart share the peculiar factual situation in which a franchisee transfers ownership of the franchise before seeking IHOP's consent, later learns that IHOP has withheld consent, does not rescind the transfer, resists IHOP's request for additional information, and indeed, falsely represents to IHOP that he has not engaged in the transfer despite having testified under oath to the contrary.  Thus, none of the entries on the chart are sufficiently similar to the instant case that any inference of disparate treatment can be drawn.  With regard to the latter exhibit, the Defendants offer no method by which the Court could determine which entries on the list are "names of Arab-American ancestry."[18]  Even assuming a reliable method of determining the franchisees' ethnicities could be employed, it is impossible to draw any inference simply from the ratio of Arab-American-named franchisees who received default notices compared to non-Arab-American-named franchisees who did.  The exhibit tendered by the Defendants merely describes, in conclusory terms, the grounds for the default notices that were issued, making it impossible to assess whether transgressions of a similar nature have been afforded equivalent treatment.  Finally, a mere listing of those franchisees who have been issued default notices is not particularly probative of disparate treatment in the absence of

---

[18]Even if the Court could somehow determine that certain names appear to have some Arabic derivation, this does not necessarily establish that the individuals with those names are actually of Arab-American ancestry.  Attempting to divine a person's ethnicity from their name is necessarily an exercise requiring significant speculation, particularly in a society where individuals are free to adopt pseudonyms or legally change their names with little difficulty.

evidence regarding the franchisees who have <u>not</u> been issued such notices – *i.e.* allegedly similarly-situated individuals who have been treated more favorably.  Although the burden of proving a *prima facie* case of discrimination is not intended to be onerous, it requires something more than inapt and statistically-invalid comparisons.

Accordingly, the Court finds that the Defendants have failed to come forward with sufficient evidence to establish a *prima facie* case of discrimination under 42 U.S.C. § 1981, and IHOP is entitled to summary judgment on those counterclaims.

The Defendants also claim retaliation, under both § 1981 and Colorado law, insofar as the 2005 default notices allegedly constitute retaliation against the Defendants for "continuing to litgiat[e] their claims" of discrimination after refusing a settlement offer, and for Defendant Khanfar offering testimony in support of Asghar Hajloo, a former IHOP franchisee, at an arbitration hearing concerning Hajloo's discrimination complaint against IHOP.  Adapting the typically employment-based articulation of § 1981's anti-retaliation prohibitions to this case, the Defendants must show that: (i) they engaged in activity protected by § 1981; (ii) that they suffered an adverse action; and (iii) that adverse action was causally connected to their protected activity.  *See e.g. Maldonado v. City of Altus*, 433 F.3d 1294, 1308-09 (10th Cir. 2006).  A causal connection may be shown by nothing more than close temporal proximity – on the order of weeks, not months – but if the proximity is not sufficiently close, additional evidence demonstrating a causal connection is necessary.  *Piercy v. Maketa*, 480 F.3d 1192, 1198-99 (10th Cir. 2007).

The Court need not engage in an extensive analysis of this claim because it finds that the Defendants have not pointed to any evidence in the record to support their various factual

allegations.  For example, nothing in the record substantiates the Defendants' assertion that the parties went to mediation in 2005, that IHOP made a settlement offer that the Defendants rejected, or that Defendant Khanfar testified on behalf of Hajloo.  A party opposing summary judgment may not simply rest on averments of fact in a brief, but must point to specific facts evidenced by affidavits, deposition transcripts, or specific exhibits in the record.  *BancOklahoma Mort. Corp. v. Capital Title Co.*, 194 F.3d 1089, 1097 (10th Cir. 1999);*Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998).  Because the Defendants do not cite to evidence in support of their assertions of protected activity, they have failed to carry their burden of showing the existence of a genuine issue of fact on this point.[19]

Colorado's Anti-Discrimination Act, C.R.S. § 24-34-402(e)(IV), prohibits any person from "discriminat[ing] against any person because such person has opposed any practice made a discriminatory or unfair employment practice by this part."  The analysis used in assessing claims under this statute closely follows the analysis used under § 1981, *see generally Colorado Civil Rights Comn. v. Big O Tires, Inc.*, 940 P.2d 397, 399-400 (Colo. 1997), and thus, the Court grants summary judgment to IHOP on this claim for the same reasons discussed above.

---

[19]Even assuming that the Defendants could successfully show that the October 2005 notices of default were issued improperly in retaliation for some protected activity by the Defendants, that showing would not be sufficient to void IHOP's termination of the franchise. Notably, the Court has found that the two defaults cited in the October 2005 notices – those that were allegedly asserted after the Defendants refused to settle – did not constitute breaches of the Franchise Agreement.  The two breaches that did occur arose prior to the commencement of this action, and thus, IHOP's termination of the franchise based on those actions could not have been retaliatory for any conduct by the Defendants as part of this litigation.

### D.  Unlawful detainer

Under Colorado law, an action for unlawful detainer seeks to eject a person from property that they no longer have a legal right to occupy.  As relevant here, IHOP must show: (i) that the Defendants' continued occupation of the restaurant became unlawful because the Defendants held over possession of the property after breaching a condition of the lease ; (ii) that IHOP gave them at least three days' notice to quit, C.R.S. § 13-40-104(e); and (iii) that  the Defendants thereafter refused to surrender the property.

Although it is undisputed that the Defendant continue to occupy the premises of the restaurant, the Defendants seek summary judgment on IHOP's unlawful detainer claim by arguing that IHOP cannot establish the first two elements – that the Defendants are in breach of the Sublease, or that they received a statutorily-adequate notice to quit/demand for possession. Turning to the first argument, the Defendants contend that IHOP asserts only that they breached the Sublease by failing to pay rent.  This is not a complete reading of IHOP's motion, which asserts that "Defendants failed to pay rent as required under the Sublease and breached several other conditions of the Sublease."  IHOP cites to several non-rent conditions of the Sublease that were allegedly breached, and it is sufficient for the Court to find that the Defendants did violate Article III.   That provision states that "The Premises shall be used solely for the purpose of conducting thereon [a restaurant] franchised by [IHOP] . . . and shall be used solely in conformity with the provisions of  . . . that certain franchise agreement [ ] made and entered into as of the date hereof."  For the reasons discussed above, the Court finds that IHOP terminated the Defendants' franchise in 2003, and thus, after 2003, the restaurant the Defendants were operating

was no longer a restaurant "franchised by [IHOP]."  The Defendants' holdover operation thus constituted a breach of Article III of the Sublease.

The Defendants also argue that IHOP's Demand for Possession did not advise them of the steps they could take to cure a default.  This argument appears to stem from C.R.S. § 13-40-104(1)(e), which purports to define the situations in which an individual is engaging in unlawful detention.  That statute provides that an unlawful detention occurs "When such tenant or lessee holds over, without such permission, contrary to any other condition or covenant of the agreement . . . and three days' notice in writing has been duly served upon such tenant or lessee requiring in the alternative that compliance be had with such condition or the delivery of the possession of the premises so held."  From this language, the Defendants derive a rule that the written Demand for Possession must "requir[e] in the alternative" that they either vacate the premises or cure any non-compliant condition.  Because IHOP's written Demand for possession did not advise the Defendants of the conditions they must cure, they argue, the Demand was insufficient under C.R.S. § 13-40-104(1)(e).  IHOP does not argue that the Defendants' reading of C.R.S. § 13-40-104(1)(e) is incorrect; rather, it contends that the Defendants were nevertheless aware of what actions needed to be taken to comply with the Sublease based on the notices of default that had previously been sent.

Accepting the Defendants' unchallenged argument that a Demand for Possession must identify an alternative cure, the Court finds that IHOP's Demand did not do so.  IHOP's Demand stated that it was made "as a result of your breach of one or more covenants and conditions of the lease," but does not purport to describe any specific breach, much less state what steps the Defendants could take in the alternative to cure any such breach.  Such a defect is particularly

30

notable given the vagueness of IHOP's own assertion as to what particular breach was giving rise to the Demand.  IHOP offers no caselaw or argument as to why the Court should ignore the apparent statutory requirement that the Demand for Possession advise the Defendants of the opportunity to cure, and in the absence of such argument, the Court declines to do so.

IHOP argues that its notice of default provided the Defendants with adequate notice of the Sublease provisions that they had allegedly breached, and that the notice of default, in conjunction with the Demand for Possession, sufficed to comply with the statute.  The Court finds this argument unavailing for several reasons, but need only address one: the notice of default does not accurately identify the grounds upon which IHOP was entitled to terminate the Sublease, and thus, did not adequately advise the Defendants of how they could cure the breach.  IHOP's notice of default alleged violations of Article XI, X, and IV of the Sublease.  Article XI concerns IHOP's remedies on default, and Article IV concerns the term of the lease and IHOP's ability to accelerate termination for cause.  Neither section contains provisions that the Defendants could breach.

Article X prohibits the Defendants from assigning the Sublease, from subletting the premises, or from permitting any person other than an agent or employee to occupy or use the premises.  Although the Court has found that the Defendant Khanfar improperly transferred his stock in 1820, Inc. to Al Sad, there is nothing in the record to suggest that either Defendant ever purported to assign the Sublease itself, nor that either Defendant ever formally sublet the premises to Al Sad.  There is also no evidence in the record that Al Sad ever occupied or used the premises.  Thus, the Court cannot find that the Defendants violated Article X of the Sublease.  As discussed above, the only substantive breach of the Sublease occurred when the Defendants

continued operating the restaurant after IHOP terminated the franchise in late 2003.  The notice of default, served in May 2003, could not possibly advise the Defendants of how to cure a breach they had not yet committed.

Accordingly, the Court finds that IHOP failed to make a Demand for Possession in accordance with the statutory terms.  Because such a demand is a necessary element of a claim for unlawful detainer, the Court denies IHOP's motion for summary judgment on its unlawful detainer claim, and grants summary judgment to the Defendants on this claim.[20]

### E.  Trademark claims

To establish a claim for trademark infringement under 15 U.S.C. § 1114, IHOP must show: (i) that it owns a valid trademark; (ii) that the Defendants used that mark in commerce without IHOP's consent; and (iii) that the use of the trademark will create a likelihood of confusion.  *Universal Money Ctrs., Inc. v. AT & T Co.*, 22 F.3d 1527, 1529 (10th Cir. 1994).  IHOP has shown, and the Defendants have not contested, that it has various protected trademarks that the Defendants have used since 2003 without authorization.  The Defendants challenge only the final element – likelihood of public confusion.  The Defendants argue that IHOP offers no evidence of public confusion, and that because IHOP's website continues to list the Defendants' location as an IHOP restaurant, customers could not be confused because "IHOP itself represents to the public that [it] is a legitimate franchise."

-----

[20]The Court expresses no opinion as to whether IHOP can serve a new Demand for Possession and, three days later, commence a new unlawful detainer proceeding in state court on the strength of that Demand.  The Court observes, however, that were IHOP to do so, an expedited resolution of that issue could be had in state court, as this Court has now resolved all other collateral issues that could delay adjudication of such an action.

In assessing the likelihood of confusion, the Court considers a wide variety of factors, including the similarity between the marks used, the intent of the person adopting the challenged mark, the relation between the goods marketed by each user of the mark, the degree of care likely to be exercised by purchasers, evidence of actual confusion, the strength of the protected mark, and so on. *Universal*, 22 F.3d at 1530.  Evidence of actual confusion is not necessary to show a likelihood of confusion, although its lack might, under some circumstances, weigh against the mark's owner. *Nikon, Inc. v. Ikon Corp.*, 987 F.2d 91, 95 (2d Cir. 1993), *cited with approval in Universal*, 22 F.3d at 1530.

Here, although IHOP did not come forward with actual evidence of customer confusion, the remaining factors tip overwhelmingly in favor of a finding of a likelihood of confusion.  The Defendants are not using marks <u>similar</u> to IHOP's protected marks; they are using precisely those same marks to sell precisely the same products to precisely the same market as IHOP.  Because both the marks and products involved are identical, there is little value in assessing the sophistication of consumers, as even a discriminating consumer would conclude that the Defendants' marks are IHOP marks.  Whatever negative inference one might draw against IHOP for not producing evidence of actual customer confusion is not sufficient to overcome the strong likelihood of confusion that is shown by the remaining factors.

Taking their remaining argument at its strongest, the Defendants argue that IHOP itself contributes to customer confusion by continuing to list the Defendants' location on IHOP's website.  Notably, IHOP does not respond to this argument in its reply.  The Court finds some merit in this contention.  On the one hand, IHOP seeks to protect its reputation against former franchisees continuing to do unauthorized business in IHOP's name.  On the other hand, IHOP

33

derives a benefit from the Defendants continuing to operate the restaurant, both insofar as it continues to enjoy a visible public presence,[21] and insofar as it appears to be undisputed that the Defendants continue to honor their monetary obligations to IHOP notwithstanding this dispute. The Court has some doubt as to whether IHOP's website's failure to disassociate itself from the Defendants' operation constitutes a sufficient basis to overcome an otherwise undisputed infringement upon IHOP's trademarks, but given the deference required at the summary judgment stage, the Court will indulge that doubt in favor of the Defendants. Summary judgment on the trademark infringement claim is denied, and a trial on this claim is necessary.

IHOP's unfair competition claim also involves the element of likelihood of public confusion. *Novell, Inc. v. Network Trade Center, Inc.*, 25 F.Supp.2d 1218, 1227 (D. Utah 1997). Thus, for the same reasons, summary judgment on this claim is denied.

### F.  Remaining claims

IHOP asserts a claim for unjust enrichment, arguing that the Defendants have unjustly benefitted from using IHOP's trademarks and goodwill in their holdover operation. Regardless of whether the Court applies California or Colorado law to this issue, it is clear that the damages, if any, that IHOP is entitled to on this claim cannot be determined on summary judgment. Because the calculation of such damages is necessarily informed by a host of equitable considerations, some of which remain unresolved at this time, the Court declines to grant summary judgment on this claim, and will resolve the matter by a bench trial at the appropriate time.

---

[21]In this regard, the case differs from a typical franchise dispute where the franchisor seeks to terminate the franchise because of the franchisee's failure to satisfy the franchisor's quality standards. Here, IHOP's disputes with the Defendants relate primarily to the organization, not the operation, of their business.

The Defendants assert a counterclaim for abuse of process.  IHOP seeks summary judgment on that claim, arguing that the Defendants cannot show that IHOP invoked the legal process for an improper purpose.  *James H. Moore & Assocs. Realty v. Arrowhead at Vail*, 892 P.2d 367, 373 (Colo. App. 1994).  The Defendants did not respond to this portion of IHOP's motion, and, as the party with the burden of proof, such a failure to come forward with supporting evidence is fatal to the Defendants' claim.  In any event, given that the Court enters summary judgment in favor of IHOP on several of its claims, the Court cannot say that IHOP's invocation of the legal process was entirely improper.  Accordingly, IHOP is entitled to summary judgment on this counterclaim.

### G.  Findings of fact

Fed. R. Civ. P. 56(d) provides that, if the Court grants a summary judgment motion in part, it should "ascertain what material facts exist without substantial controversy, and what material facts are actually and in good faith controverted," and shall "thereupon make an order specify the facts that appear without substantial controversy."  These facts are deemed established for purposes of trial.  *Id.*

Based on the parties' submissions and the foregoing discussion, the Court finds that the following material facts are not substantially controverted, and are deemed established:

1.  On September 29, 2006, Defendant Khanfar and IHOP entered into three separate contractual agreements: a Franchise Agreement, entitling Defendant Khanfar to operate the restaurant; a Sublease, entitling Defendant Khanfar's restaurant to occupy a building owned by IHOP; and an Equipment Lease, entitling Defendant Khanfar to use various restaurant equipment for the operation of the restaurant.

2.   On July 8, 2002, IHOP and Defendant Khanfar entered into an Assignment Agreement, permitting Defendant Khanfar to assign all of his rights and obligations with regard to his various agreements with IHOP to a corporation, Defendant 1820, Inc.  The Assignment Agreement required that Defendant Khanfar retain a majority interest in 1820, Inc. at all times.

3.   On January 1, 2003, Defendant Khanfar transferred the entirety of his majority ownership of 1820, Inc. to Mohammed Al Sad.

4.   The Defendants sought IHOP's permission for the assignment of the franchise to Al Sad, but on April 8, 2003, IHOP rejected the proposed sale.

5.   On May 27, 2003, IHOP wrote to Defendant Khanfar, advising him that testimony he had given in a court proceeding in El Paso County, Colorado represented that the sale to Al Sad had been completed, and that Defendant Khanfar no longer possessed an interest in the franchise. IHOP informed the Defendants that such actions constituted breaches of the parties' agreements, and advised Defendant Khanfar that unless he could establish his continued ownership of 1820, Inc., IHOP would deem the Defendants in breach of the agreements and terminate the franchise.

6.   On  June 18, 2003, Defendant Khanfar responded to IHOP, stating that the sale to Al Sad was never completed.  This assertion is contrary to the testimony given by Defendant Khanfar in the El Paso County proceeding.  The January 1, 2003 transfer of ownership of 1820, Inc. to Al Sad was never undone.

7.   As a result of Defendant Khanfar's transfer of ownership in 1820, Inc. to Al Sad without IHOP's permission, the Defendants breached Sections 11.02 and 11.03 of the Franchise Agreement, and Sections 2(a) and 3(c) of the Assignment Agreement.

36

8.  As a result of the Defendants' breach of the Franchise Agreement and Assignment Agreement, IHOP terminated the Defendants' franchise effective December 29, 2003.

9.  The Defendants have continued to operate an IHOP restaurant at the location, using IHOP's trademarks, notwithstanding the termination of the franchise.  This continued operation constitutes a breach of Section 15.01 of the Franchise Agreement, Article III of the Sublease, and Article II of the Equipment Lease.

## CONCLUSION

For the foregoing reasons, IHOP's Motion for Summary Judgment **(# 135)** is **GRANTED IN PART**, insofar as IHOP is entitled to summary judgment on its claims for breach of contract based on the Franchise Agreement, Sublease, Assignment Agreement, and Equipment Lease, and **DENIED IN PART**, insofar as the Court finds that a trial is necessary with regard to its claims for breach of contract based on the Guaranty and Promissory Note, its claims for trademark infringement, unfair competition, and unjust enrichment, and that the Defendants are entitled to summary judgment on the unlawful detainer claim.  The Defendants' Cross-Motion for Summary Judgment **(# 143)** directed solely at the unlawful detainer claim is **GRANTED**.  The Defendants'

Renewed Motion for Extension fo Time to Respond **(# 151)** and the Defendants' Motion for Extension of Time **(# 160)** are **DENIED AS MOOT**.

Dated this 6th day of September, 2007

**BY THE COURT:**

Marcia S. Krieger
United States District Judge